May it please the Court, my name is Rex Heineke and I'm here on behalf of the appellants who I'll refer to as Burton Way. With the Court's permission, I'd like to reserve two minutes for rebuttal. The first issue that I'd like to turn to is the question of whether Four Seasons had a fiduciary duty to Burton Way here. Four Seasons says, and the District Court agreed, that it had no duty to Burton Way at all even though it had 100% of the relevant information about the Regent chain. Why did the District Court say that? It said it because it said, well, you were adverse. Burton Way, Four Seasons, you were adverse, therefore there was no fiduciary duty. We submit that that is not the law, that the fact that you're adverse does not abolish your fiduciary duty. First, the cases make that quite plain. The cases we've cited, the Stevens, and I'm not sure how you pronounce it, the Simme case, S-I-M-E case, both say squarely and unequivocally that there is still a fiduciary duty if there's litigation or if there's a quarrel between the parties. That cannot abolish a fiduciary duty. This is especially true because it's so easy for an agent to create a dispute. So I think they've responded, I think, to your Stevens argument by saying that the breach of fiduciary duty happened before, happened earlier, but I'm wondering whether you are also arguing that really the breach happened earlier. Like, so it seems like the arbitrators thought that the fiduciary duty claim was about the negotiation of the new HMA agreement, but are you trying to argue that really there were fiduciary duties maybe before the actual negotiation, or are you agreeing that the right understanding of when this fiduciary duty came into play was during the negotiation itself? No, no, there were fiduciary duties before the breach because they were our agent, and so they had a number of fiduciary duties and contractual duties to us. But what we are claiming here is the breach of their fiduciary duty is their lack of candor about what they knew that was relevant to the negotiation of the 1998 amendment to the hotel management agreement. And are you saying that the breach occurred when you were at the table negotiating, or are you saying that the breach of fiduciary duty occurred as Four Seasons was managing the hotel and there was stuff going on with the other hotel and they didn't disclose kind of along the way in the lead-up to the negotiation? The whole thing. We didn't know what was going on before the negotiations. They knew and they were obliged to disclose that information to us as our agent. And that's the duty of candor. They also breached all sorts of other duties. They competed with us, which they could not. They did not maximize our profits, which they were expressly obliged to do by the hotel management agreement. So it's the combination of all those things. Their basic position is we can go breach our agreement with you, and because we breached, we're adverse. And because we're now adverse, we have no fiduciary duty. If that's the law, there's no fiduciary duty at all because all you have to do is create adversity. Say, we're adverse, and fiduciary duty goes out the door and it ceases to exist. And I submit it cannot be the law if you look at other situations where there are fiduciaries. For example, in the Vade case, which we cite, the California Supreme Court case, there the court said that partners, when there's a partner dissolution, have fiduciary duties to each other. Well, obviously at that time they know that they're adverse. That's why they're having the dissolution. And the court also said that there's a fiduciary duty when a husband and wife divorce. Well, plainly, at that time when the divorce is going on, they know there's a dispute, and yet they still have fiduciary duties to each other. It simply cannot be the law that because parties are adverse, the fiduciary duty goes out the door. Now, there are other arguments that Four Seasons raises. Four Seasons says, well, we were negotiating about our compensation, so we owe you no fiduciary duty. But the negotiations were not about Four Seasons' compensation. Four Seasons had not come to Burton Way and said, we're not making enough money off of this. We want you to raise what you're paying us. What had happened was Four Seasons had breached its duty to us by running a competing hotel within one mile of our hotel. That clearly breached the radius clause. So the negotiations were about what was Burton Way going to get from Four Seasons to compensate it for this breach. But it wasn't about Four Seasons coming in the door and saying, gee, please pay me some more money. If compensation means what they say it means, which is a change in the economic relationship, then, again, fiduciary duty goes out the door because there are always changes in the relationship, and most of those are going to be economic between a principal and an agent, certainly in circumstances like this. Four Seasons also says, well, our agreement with you does not cover the negotiation, the changing of our agreement. That's not part of our duty. But their duty to us was not to compete and to maximize our profits. That's what the negotiations were about, how that could be lessened, because they wanted those duties lessened. So it was squarely about the heart of the agreement. That's what the negotiations were about, the terms of the agreement. They weren't about something that had nothing to do with the agreement, like could we operate a second hotel in Chicago. They were about how this hotel was going to be operated. Could you explain the relationship between your fiduciary duty arguments and your fraudulent inducement claim? Are they connected? No, they're different. Well, they're connected on the facts, but different on the legal theories. That is, we claim two things. On the fiduciary duty, we say they had a duty of candor and disclosure of all material relevant facts, period. And they had to disclose those to us, and the failure to do that breached their fiduciary duty. And what would be the recovery for that? I mean, what are you seeking in response to that argument? Well, that might take us to another issue, which is rescission is one possibility, and then the alternative is damages for breach of the agreement. That is, that the 1998 provisions do not control, only the prior provisions control. They breached those provisions, so what are the damages for a breach of those provisions? To further answer your question, on the fraud claim, we understand that it would be a misrepresentation claim, and we'd have to prove fraud and misrepresentation. But the elements of that are not the same as a breach of a fiduciary duty claim, which is simply, did they breach the duty, and the question there is, did they tell us all the relevant material information? But you could have fraud from a material omission, which could be a duty, and you could have a duty to disclose that arises from a fiduciary duty. So I'm trying to figure out if these are kind of one, sort of one theory or not, in some sense. Two different theories, because on the fraud claim, you'd have to prove it was an omission they were obliged to disclose. On the fiduciary duty claim, they were obliged to disclose it. There isn't any question about that if there's a fiduciary duty. So there's some difference there. Certainly they're closely related. They're closely related on the facts. That is, what information did they have, what did they tell us, and so on. But they're different. If I could ask you a very similar question to Judge Friedland. So we have our first, you know, the first issue as I look at this case is the 1998 HMA, and did the panel get it right to cite the, I'll call it the high-speed car chase from the Supreme Court with the videotape. Oh, right, right. So, and the panel said, yes, under that car case, or car chase case, we can basically say summary judgment was proper. Let's say, hypothetically, we agree with you that the panel got that wrong. Right. That that was a misuse of the Scott versus Harris case. Right. What happens to the rest of this case? If you win that issue, there are a number of issues in this case. Yes. If you could kind of just explain to me the chain reaction that occurs. If we agree with you on that issue, what happens next in the case? Well, as to that, we would ask the court to remand for trial on that question. That is, the interpretation of the agreement. Who would the trial be before? Another arbitration panel. And how do we know it's another arbitration panel? Because California law says expressly that if you are remanded, you get a different arbitration panel. That's right. That was in the reply brief, I believe. I thought it said may, though. I thought California law said maybe before. I could be wrong, but. Hey, I don't think so. I think it says. It's mandatory that it's before a different panel? Yes, we could waive that, I suppose. I recall it requires it unless you agree. Right. I believe that's it. We could waive it. I think I'm not sure. The may had to do with the fact that if the parties agree, it would be remanded to the same panel. Right. But without an agreement, it's a different panel. So this would go back to the district court who would send it to an arbitration panel. I'd like to get some time. You wanted to know. Right. So then there are these other claims in the case. I know you probably want us to send them all back. But in the chain reaction, are those still independent? Or are those in some way dependent on the ruling on the first issue? No. We believe they're independent. Okay. It's a contract claim. Was there a breach of contract or not? But that's the breach of the 98 agreement. The fraud and the fiduciary duty claims would wipe out, if we prevailed, would wipe out the 1998 amendments. Maybe I can shortcut my question to the other issue of whether to manage or operate includes the other aspects of the separate clause, I think, fourth. When you laid out the operation and management, whether that included the use of the special assets of the Four Seasons, as I understand the differences and explain this to me, they considered that extra provision to be a part of contract and management. And you say that's a separate provision that's not included within contract and management. Correct. We say what the agreement calls the Four Seasons operational benefits, we say those are different than operate and manage because they're both in Clause 26A. And so they cannot possibly mean the same thing. If manage and operate covered the Four Seasons operational benefits, then there'd be no reason to refer to them because they would already be covered and all the provisions, which are fairly extensive as to finding what the operational benefits are, would be surplus. They shouldn't be there at all. So we submit that if you just look at the face of the agreement, it cannot be that they're the same. And if they're different when you go to B, then what B says is, well, you can manage or operate, and it says you can use the operational benefits under certain circumstances. But it doesn't wipe out the general prohibition on the use of the operational benefits. It simply says you can't use them, oh, wait a second, in B. You can use them under these circumstances. Whereas Four Seasons' position is that the prohibition of use of operational benefits in A ceases to exist entirely because of B. If that's what the parties had in mind, it would have been simple. They put in one sentence. It says you can use the operational benefits. But they didn't do that. You submitted a fairly extensive affidavit as to what that meant based on the negotiations. Correct. And the arbitrators still granted summary judgment? Yes. The arbitrators said we've looked at the documentary evidence, we've looked at the declarations, and we conclude that nobody could possibly believe what our declarant said. We submit that's not the law. I was trying to line up the declarations with the negotiating history, and there's someone named Eddie Cohen. Who is Eddie Cohen? Do you know who he was representing or what his role was? Because I can't figure out who he is, and he appears in a lot of these documents about when this language got added. I'm sorry, I don't know the answer to that. I could provide the answer to the court, but I don't know the answer. It looks like your opponent knows, so maybe we'll find out from him. But did the arbitrators weigh the credibility of this? Yes, on summary judgment, and that's what we object to. We say you cannot do that on summary judgment. Frankly, to me, it's hornbook law. You cannot weigh credibility on a summary or judgment motion, and that's exactly what they did. They granted summary judgment, or I suppose technically summary adjudication, because it was a cause of action, but they did it without any trial whatsoever, and we submit you just cannot do that. That is not appropriate at all. I see others. Can I ask you a question back on this? I may be the only one who's worried about this fiduciary duty overlapping with fraud, but I have another question about that. So the Oakland Raiders dispute that you have about what the Oakland Raiders case means, does that dispute control both the fiduciary duty claims and the fraud claims? No, because it relates to the 2002 amendment, not the 1998 amendment. I thought it was the 2010. I thought it was the 2010. But the 2010, okay, so I thought the issue was did the 2010 amendment ratify the 1998, and if it did, would it ratify it in a way that gets rid of the fiduciary duty claims and the fraud claims? I mean, I may not think it did get rid of it, but if it did, does it cover both of those types of claims or only one or the other? I believe that's Four Seasons' position, that it covers everything. But you'll have to ask them, but I think that's their position. So I understand why you say Oakland Raiders doesn't apply, but say we say Oakland Raiders does apply. Do you have a reason why it only applies to the fraud and not the fiduciary duty, or is the theory the same? Well, I don't think they've ever argued what you're articulating. So if that's going to be the question, I'd ask an opportunity to file something supplemental. I think that argument's been waived because it hasn't been made here. May I ask you a question similar to what Judge Owens asked? The issue that I asked about, let's assume we said the arbitrators were wrong to grant summary judgment on the meaning of the benefits phrase in the contract, and therefore that question was decided in your favor. It should not have been summary judgment. It goes back. Does that have any effect on whether the issues that Judge Friedland and Judge Owens have asked you about, whether those issues would also go back? Would the full arbitration be open, or would you have to prevail independently on each of the claims? Well, if you mean each of the claims, the fiduciary duty and the fraud claim? Yeah. I don't think that if this Court said the summary judgment on the interpretation in the agreement was improper and it has to go back for trial, I don't think that would determine the outcome of the fiduciary duty and fraud claims. No, not the outcome. I mean, would anything have to be decided by the arbitrator on those claims? If the only thing that was remanded was the contract claim? Is that the question? If the only thing that were reached were the contract claims, let's say, and we said, yes, the contract should have been determined by the arbitrators. And otherwise everything that happened below was affirmed? It's possible to say that that's all that matters. We remand that. We remand the entire arbitration, all the issues for arbitration. I think you have to look at, for example, whether there was a fiduciary duty. I don't think the determination of the contract would determine that, nor do I think it would determine this question of whether there was a waiver of the fraud claim. So each of the claims has to be evaluated separately? I believe so. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court, William J. for four seasons. Let me begin by agreeing with Mr. Hanke that, yes, each claim stands on its own bottom, and I think that you have to take each one on its own terms. A remand on one doesn't entail remands on the others. Let me begin where Mr. Hanke began with the breach of fiduciary duty claim and whether a duty was owed. I think that the colloquy between Judge Friedland and my friend is important because what the breach of fiduciary duty claim is about was looking forward to what the consequences of this radius restriction would be, or the relaxation of the radius restriction would be, and not backward about past conduct, and that's because in the agreement itself, the 1998 agreement, there is a release. This is at ER 1568-69, Exhibit 7B to the 1998 amendment, wherein for past operation of the Regent Beverly Wilshire, the Burton Way gave a complete release of all claims, known and unknown, jumping through all the hoops that California law requires for such a thing. That's why their fiduciary duty claim focuses prospectively on what Four Seasons allegedly should have told them about the value or importance or probabilities about the amended radius restriction that was going to be put into the 1998 amendment. We think that's very significant because what the parties were negotiating about was the scope of the agency. It was not about the operation of the Four Seasons Los Angeles, about Burton Way's hotel, the purpose for which Four Seasons is their agent. After all, the basic principle that we think governs whether there was a duty here is that there is no fiduciary duty except in a transaction in which we are employed, in which the agent is employed. That's from restatements. So Four Seasons was managing the Burton Hotel, and why wasn't there a duty to disclose, as the fiduciary in that capacity, what Four Seasons knew about how the Beverly was going to be run? I mean, there is this third entity, so it's not just a negotiation really over compensation. There's also sort of what's going on with this Beverly Hotel and what does Four Seasons know about it? And I wonder whether those obligations kind of arose apart from even the renegotiation but just generally in the fiduciary duty. Can you respond to that concern? Well, again, I think it would only be looking forward on what was going to happen once the radius restriction was put in because everything before the 1998 amendment is released. So if their allegation is you should have told us, because you are our agent in running this hotel, what are the consequences of allowing you to do these other things, allowing you to run this other hotel in this way, to use these operational benefits or not, that goes squarely to the scope of the agency. The simplest analogy I can give is that when an agent bargains with the principal, the agent has been the exclusive agent and wants to have a negotiation about whether going forward you won't be the exclusive agent anymore, you can take other clients. That is not a fiduciary transaction. The agent is not representing the principal in that negotiation. The agent is negotiating for himself. Is there an obligation not to make affirmative misstatements even if there's not a fiduciary duty? Yes, and that's not the basis of this claim. But I thought that they had alleged. So haven't they alleged that there was a statement by Four Seasons that the Beverly Wilshire would not harm the Burton Hotel and that it would in fact be beneficial? That sounds to me like potentially an affirmative statement. I think it's at ER 550 to 551 where that's alleged. And I wonder if that's sort of apart from the fiduciary duty anyway. Yeah, I think that that's – that allegation doesn't then come back in the allegations under the – under the – if you look at the amended complaint, the list of alleged things concealed and not stated in the alleged breach of fiduciary duty, I think you won't see an allegation that it's – that we affirmatively, fraudulently misled them into making the 1998 agreement. And if they were trying to allege – well, I guess they do have their fraudulent inducement claim, right? And their fraudulent inducement claim, that's the – the consequences of that are governed by the 2010 amendment. And perhaps I should turn to that, you know, right now unless you have further questions about the fiduciary duty. No, I'll look at the complaint and try to track that down. But – so I would be interested in hearing what you thought about the fraudulent inducement. Right. The basic point from California law is that when you ratify an agreement, and there's no doubt that the 2010 amendment ratifies the 1998 amendment right there in the – on the first page, and says that it shall remain in full force in effect except as modified in the 2010 amendment. That's exactly the kind of language that precludes a party from then bringing a suit to invalidate the prior agreement that is thereby reaffirmed. You can't – you know, the principle of California law is you can't affirm and sue. And it's that language, the expressed statement that the 1998 amendment shall remain in full force in effect that we think has the relevant consequences here. And the next sentence goes on to say that other matters, matters not addressed in the – in the 2010 amendment are reserved. But that doesn't reserve – you know, that doesn't undo the consequences of the immediately preceding sentence. That's why we think that that claim cannot survive. That's the – and that basically is the fraudulent inducement in a nutshell. I mean, the other side cites a couple of cases, but none of them has said that you can affirm and sue. And, indeed, none of them even say – But none of them had any kind of reservation of rights, right? So we're in a little bit of a different – we're somewhere in between a situation where cases don't exactly cover it, aren't we? I agree with that. But I think that the reasoning of the cases points clearly to the answer in this case, because the reasoning of the cases is that you can't take the substantial benefits. You know, if you look at Oakland Raiders, it's the benefit, the significant concessions made in that case, which the court of appeals said were sufficient to justify the estoppel. So part of Oakland Raiders was about the idea of kind of keeping secret the idea that you thought there had been fraud. Did they ever tell you before the 2010 agreement that they thought there were either breaches of fiduciary duty or fraudulent statements prior to then that they had concern about? Well, I guess you're kind of expanding the question. Yeah, okay, let me see what's fraud. I'm sorry, I did too many things at once. So did they ever allege an affirmative, fraudulent statement before the 2010 agreement? All I can say is I think there's nothing in the record saying that they did. I think it is significant that, so they signed the 2010 amendment. Then a few days later, they filed a complaint. But that complaint didn't actually have the fraudulent inducement count in it. That came later on in the litigation. So I think the answer is there's no record evidence that they told us that they were trying to preserve that. The only extrinsic evidence they've tried to bring in about the 2010 amendment is to kind of knock down a straw man. They say, we wouldn't give you a release of everything. Well, we're not saying they gave us a release of everything. We're saying that they agreed to language that knocks out one kind of claim, fraudulent inducement claim, that attacks the very basis of the 1998 amendment that they are reaffirming. Is it your position that the Oakland Raiders theory kicks out the fiduciary duty claim too? No, because I think the fiduciary duty theory is based on the concealment, the alleged concealment, and that they are seeking damages for that. And you don't, okay. Okay. As Mr. Hickey said, we've not argued that that applies beyond the scope of that claim for fraudulent inducement because, you know, that is the kind of claim that is knocked out when you reaffirm a prior contract. Before we forget, you seem to know who this mysterious gentleman was. Eddie Cohen. Eddie Cohen. Mr. Cohen, and this is, I think if you look at page 563 of the excerpts, you'll see the first, at the very beginning of his declaration, he says who he is, and he was counsel to Burton Way, one of the lawyers for Burton Way. And I will, right. So turning to that and to the declarations more generally, we think that the basic holding of the panel on the interpretation of the contract doesn't really turn on the extrinsic evidence at all because it is that the contract is not reasonably susceptible to the meaning that the other side tried to give it by bringing in this extrinsic evidence. And because of that, there is no material factual dispute whether or not you credit either one side's declarations or another. I thought you could, under California law, that that ambiguity can be created by the extrinsic evidence. Even if it appears to be plain on its face, it can be made unplain by the introduction of extrinsic evidence. Not quite, Your Honor. I think that you're certainly right that the court is to receive the extrinsic evidence. The court is not to just say myopically, I can see this document. This document is unambiguous to me. Therefore, I won't even look at anything else. But the court is to, this is the language of the California cases, like Wolf, receive provisionally the extrinsic evidence, look at what construction the proponent of that evidence is advancing, then look back at the document and decide whether it is reasonably susceptible of that construction. If not, if it is not reasonably susceptible of that construction, then there is no work for the extrinsic evidence to do, and there is no need to resolve any fights about the extrinsic evidence. It's just decided as a matter of law. So you're certainly right that you don't decide whether there's ambiguity until you've taken a peek at the extrinsic evidence to see what construction is being advanced and whether the meaning is reasonably susceptible, the document is reasonably susceptible to that meaning. But no further than that. The panel did that, but ultimately concluded correctly in our view that the agreement is unambiguous. And that's because turning to the amended radius restriction 26.01, there is no restriction in B other than the specific ones on how Four Seasons will use the operational benefits at the second hotel, which for this period was the Regent Beverly Wilshire. So I think the allegation that we've made that our construction makes the reference to the Four Seasons operational benefits surplusage in the first subsection, subsection A, I think that's dealt with completely by some words that Mr. Henke didn't quote when he was going over the three parts, which is contract or license. The restrictions in A are Four Seasons may not own, lease, manage or operate, or contract or license the benefits. You could take away the power to manage or operate without also taking away the power to contract or license. And we submit that this is put in so that Four Seasons could not license out its intellectual property or other access to other operational benefits without managing or operating the hotel. I think that's confirmed. This is difficult to read, I know, but in subsection B, about in the middle of the page in the addendum, if you'd rather look at the excerpts version, we can do that. But this is in the addendum to the blue brief. So this is the definition of second hotel. And about half, almost exactly in the middle of the page, there's a subsection B, such hotel does not at such time or thereafter use or license nor is permitted to use or license any of the Four Seasons operational benefits. So we've gone through one, two and three in subsection A, leases, manages, operates, or owns, leases, manages or operates. But then the contract goes on to say, and you also can't use the operational benefits at the Beverly Wilshire if you're going to have a second hotel. In other words, it's perfectly clear that there are reasons to restrict the contracting or licensing of operational benefits. But ultimately, what power is given to Four Seasons in subsection B is the power to manage or operate, subject to a couple of restrictions on specific operational benefits, like the use of the name, like the use of the centralized reservation system. But for things not expressly addressed in B, such as, for example, the centralized purchasing system, that's plainly within the scope of management or operation. Deciding which purchasing system you're going to use at the hotel you manage or operate is part of the grant of power to manage or operate. So because the construction doesn't, that we've given and that the arbitrators and the district court gave, does not give the operation benefits. The definition is centralized reservations, purchasing or sales and marketing systems is one of the definitions of that. That's right. And what I'm saying is that the power to manage or operate includes the power to use, for example, the Four Seasons centralized purchasing system at the second hotel, not at any other place within the radius. That's governed by A, but the second hotel and the second hotel only is governed by B. So they can use the Four Seasons operational benefits within the power to manage or operate, except as that's taken away. Now for the reservation system, that power is taken away in part. They can't use the centralized reservation system at the second hotel unless certain things happen. That really is what the whole trial was about, whether those things had happened and whether Four Seasons had used its best efforts as necessary to trigger that. And the arbitrator is found in our favor. So subsection B applies only at the second hotel and gives us the power to use those Four Seasons operational benefits, except as taken away. Within the radius, except at the second hotel, including at the Regent Beverly Wilshire, if it ceases to be the second hotel, as defined by this agreement, then that would be governed by A. I see that my time has expired. Are there other questions that the panel wish to put? Thank you very much. Thank you. I have 21 seconds. Well, we'll give you a little extra time. We'll give you two minutes. I appreciate that. You already, I think, we've answered the question about Eddie Cohen. He goes by Ezra Cohen, and so he gave me a note and will discipline me when I get back. On the question here of the operational benefits, our position is really fairly simple in the end, despite there's a lot of language there that you have to parse through. Our position is simply that in A, all use of operational benefits was prohibited. Second hotel, third hotel, any hotel. In B, Four Seasons was allowed to use operational benefits at the second hotel, which is the Beverly Wilshire, but only under certain circumstances. It was not given the right to use all operational benefits under any circumstances whatsoever. And I think that is the key thing here  and Four Seasons' position, that the FSOBs, there should be some way to say that, the Four Seasons operational benefits, our client insisted that be put in the agreement. And the other side doesn't say that they objected to that, because they didn't, they agreed to it, and we told them at the time that our interpretation of the agreement was that by adding that to A, all they could use at the second hotel in B was what was specifically set forward. They don't dispute that. That is, they don't offer any evidence to show that's not the case. And so we submit that, frankly, not only should it not have been given summary judgment, but in fact, on the face of it, we submit that it's clear what the meaning is here. Can I go back to the fraud for a second? Had you alleged fraudulent conduct, whether omissions or affirmative misstatements, prior to the 2010 agreement? We had not, because we did not know there had been a fraud. We didn't know the information we learned. It wasn't in our original complaint, because we didn't learn it. It was in the amended complaint when we did learn it. How did you eventually learn it? Well, because there was discovery, and we learned through the discovery what information Four Seasons knew from the Regent hotel chain and what it knew from the Beverly Wilshire, because, of course, we didn't know those things. We had no role with Regent. We had nothing to do with operating the Beverly Wilshire hotel, so we did not know all the information that Four Seasons had obtained from them. But we learned about that during the discovery. That's when we added the fraud claim. Thank you. Thank you both very much. Very helpful argument. And the case, as argued, will be submitted. The Court will stand in recess for the day. All rise.
judges: Reinhardt, Owens, Friedland